UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BETH HARRISON,                                    Case No.  1:15-cv-514

        Plaintiff,                                Judge Timothy S. Black

vs.

PROCTER & GAMBLE
DISTRIBUTING, LLC,

        Defendant.

**ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT (Doc. 34)**

This civil action is before the Court regarding Defendants' motion for summary

judgment (Doc. 34) and responsive memoranda (Docs. 40, 44).

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    Factual Background

Plaintiff Beth Harrison has been an employee of Defendant The Procter & Gamble

Company Distributing, LLC ("P&G") since 2000.  Defendant has worked in several

different departments at P&G and currently works in P&G's Trademark Licensing

department.  (Doc. 34, at 13)[1].  However, for purposes of this suit, most relevant activity

took place while Plaintiff was employed in P&G's U.S. Customs Compliance department

as a customs broker from August 2011–May 2015.

---

[1] All citations to the record cite to the document number and document page number assigned by
the Court's ECF electronic filing system.  These page numbers do not necessarily correspond to
the internal page numbers self-assigned by the document in question (for example, if a document
has a table of contents without assigned page numbers).

1

For nearly all of Plaintiff's tenure with P&G, Plaintiff has been approved to take certified leave under the Family Medical Leave Act ("FMLA") as needed to care for her son, who suffers from a serious health condition that requires life-long care and can "flare up" intermittently and unpredictably. (Doc. 1, at 10). There was no significant friction between Plaintiff and Defendant arising from Plaintiff's taking FMLA leave for her son on an as needed basis before 2012. (*Id.*).

The changing factor that appears to have been the catalyst for the conflict leading to this lawsuit was the arrival of a new manager in the U.S. Customs Compliance department, Barbara Konerman, in February 2012. (*See* Doc. 34, at 3). According to P&G, it was around this time that Plaintiff began having issues with attendance and with maintaining a consistent work schedule as required. (*Id.* at 4). Defendant alleges that "throughout 2012 and much of 2013, [Plaintiff's] availability was an issue." (*Id.* at 4). Plaintiff frequently notified Ms. Konerman that Plaintiff would be coming in late to work, leaving work early, or missing a work day entirely with very little notice, often same day notification. (*See* Doc. 34-1). It is undisputed that many of these absences were for FMLA reasons, including doctor's appointments for Plaintiff's son. However, Plaintiff also admitted to unilaterally deciding that she could arrive at work at varying hours, despite having received instructions to the contrary. (Doc. 29, at 34–37).

Barbara Konerman had a meeting with Plaintiff on August 6, 2013 to discuss the perceived problems with Plaintiff's unavailability during core work hours. (Doc. 34, at 3–4; Doc. 40-3, at 64). Plaintiff was instructed on the need to provide proper advance notification for FMLA absences in non-emergency situations. (Doc. 40-4, at 20).

Additionally, as a result of her continued problems with unavailability, Plaintiff's ability to work from home was limited to one day per week. (*Id.*). Typically, employees in the U.S. Customs Compliance department were permitted to work from home 40–50% of the time. (*See* Doc. 32, at 31–32).

P&G uses an annual employee performance rating system wherein each employee receives either a "1", "2", or "3" ranking, with a 1 indicating that the employee exceeded expectations, a 2 meaning an employee met expectations, and a 3 meaning an employee performed below expectations. (Doc. 34, at 3 fn. 2). The scores are distributed in a bell curve for each department. (*Id.*). Plaintiff's annual review scores had varied in the years before her 2011–2015 stint in the U.S. Customs Compliance department. Plaintiff had earned a 3 ranking for the 2011 fiscal year, the year immediately preceding her transfer to U.S. Customs Compliance, reflecting her performance in the Baby Care Regulatory department. (Doc. 29, at 18). Plaintiff automatically received a 2 rating for the 2012 fiscal year as she had transferred to a new department. (Doc. 40-3, at 65). At the August 6, 2013 meeting referenced above, Plaintiff was informed that she would be receiving below a "2" rating for the 2013 fiscal year. (Doc. 40-3, at 64). Plaintiff was informed on October 18, 2013 that she had in fact received a 3 rating. (Doc. 34, at 5). As a result of her 3 rating, Plaintiff was placed on a Performance Improvement Plan ("PIP") on November 1, 2013. (*Id.*; *see also* Part III.A.1.b, *infra.*).

Following the negative feedback she received for fiscal year 2013, Plaintiff began seeking to transfer to another position within P&G. (Doc. 29, at 110–11). She also began to show signs of distress at work, including episodes where she lost control and

cried at her desk for extended periods of time. (*Id.* at 120–23). Plaintiff had been encouraged by Barbara Konerman to apply for FMLA leave for herself based on excessive absences due to personal illness (*Id.* at 96, 110, 118), and in late November 2013 Plaintiff successfully applied for FMLA leave for her depression. (*See id.* at 118).

As part of Defendant's continuing feedback regarding Plaintiff's perceived attendance issues, Ms. Konerman issued to Plaintiff a document titled "2014 Performance Expectations" on December 13, 2013. (Doc. 40-4, at 23). The document identified additional restrictions on Plaintiff's schedule and on how she would be able to use and report FMLA leave in the future. Plaintiff had previously been allowed to take unpaid leave for FMLA leave if she wanted to conserve her vacation time, but moving forward Plaintiff was required to use vacation time for her FMLA leave for the first 10 work days of absences, and could use unpaid time off afterwards. (*Id.*). This change was not applied only to Plaintiff, and was in fact a reflection of a change in P&G company policy. (*See* Doc. 33, at 21–22 (deposition testimony of former HR manager Tayyib ("Ty") Rashid)). P&G company policy also required any employee taking vacation time to take at least 4 hours at a time; accordingly, Plaintiff was required to use at least 4 hours of vacation time for any FMLA leave, no matter how long any particular appointment actually took. (*Id.*). Plaintiff's work from home privileges were entirely revoked at this time. (*Id.*). Additionally, the document required Plaintiff to be available to work from the "core hours" of 9:00 a.m.–5:30 p.m. as opposed to her previous core hours of 9:00 a.m.–3:00 p.m. (*Id.*).

Defendant continued to have concerns regarding Plaintiff's non-FMLA absences and her failure to timely report anticipated FMLA appointments. Of particular note was an instance on December 16, 2013, when Plaintiff requested leave to attend a funeral on December 19, 2013. (Doc. 34, at 7). Plaintiff's request stated that she would be attending a "visitation, funeral, and burial" on the 19th. (Doc. 29-1, at 82). Plaintiff's leave request was granted. (*Id.*). The visitation and funeral service in question was actually held on the evening of the 18th. (*Id.* at 83). Plaintiff did not attend any of the funeral related events on the 19th; during the time of the burial, Plaintiff was at home sending messages to a colleague in a different department at P&G inquiring about a transfer. (*Id.* at 84). This incident damaged Defendant's trust in Plaintiff's credibility. (Doc. 34, at 7).

On January 8, 2014, Ms. Konerman sent Plaintiff an email imposing an additional requirement on Plaintiff's use of FMLA leave. (Doc. 40-3, at 119). Moving forward, Plaintiff would be required to provide to P&G a note signed by a doctor for each FMLA appointment. The notes were required to contain the doctor's name, date of visit, time left, and time arrived. (*Id.*).

Plaintiff's FMLA leave increased after she began taking FMLA leave for her own condition as well as her son's. Ms. Konerman accordingly informed Plaintiff on January 30, 2014 that a portion of Plaintiff's responsibilities would be reassigned to other employees in the U.S. Customs Compliance department in response. (Doc. 29-1, at 119). During that time period, Plaintiff was on FMLA leave approximately 25% of the time, and a proportionate percentage of her responsibilities were reassigned. (*Id.* at 125).

On February 2, 2014, in response to the reassignment of a portion of her responsibilities, Plaintiff contacted her HR representative at P&G, Ty Rashid, to claim that Ms. Konerman was retaliating against her for taking FMLA leave. (*Id.*). Mr. Rashid and Tracy Stanton, an HR Administrator at P&G, met with Plaintiff on February 4, 2014, to discuss her concerns. (Doc. 34, at 8–9). Plaintiff outlined her concerns regarding her decrease in work responsibilities, her newly imposed requirement to use vacation time for FMLA leave, and her belief that her continued failure to successfully be reassigned to a new job at P&G was due to Ms. Konerman's retaliation for FMLA use. (*See* Doc. 33-1, at 15–20 (Tracy Stanton's notes of the meeting)). Plaintiff also generally stated her belief that Ms. Konerman was "aggressive" toward Plaintiff and generally unwilling to accommodate Plaintiff's need for FMLA leave. (*Id.*). Mr. Rashid explained that Plaintiff's decrease in workload was necessary given her FMLA leave removing her from work for a significant portion of the time and that Plaintiff's 3 rating and ongoing PIP were significant factors affecting her ability to be hired at a transfer position. (*Id.*). Mr. Rashid also agreed to Plaintiff's request that he be present at future meetings between Plaintiff and Ms. Konerman regarding Plaintiff's performance. (*Id.*). Plaintiff indicated at the end of this meeting that her concerns had been addressed by Mr. Rashid. (*Id.*).

[REDACTED]

Shortly afterwards, Jason Hall, Barbara Konerman's supervisor, transitioned Plaintiff from reporting to Ms. Konerman to reporting directly to him. (Doc. 33-1, at 27). This was done out of concern for both Plaintiff and Ms. Konerman, who was becoming increasingly distressed by the difficulties associated with managing Plaintiff. (Doc. 31, at 28). Plaintiff was in favor of this transition when informed on February 14, 2014. (Doc. 33-1, at 27). However, Plaintiff reiterated her suicidal thoughts to Mr. Hall in a meeting on February 18. (*Id.* at 28).

Due to [REDACTED], as well as the results of a recent audit demonstrating that Plaintiff's work product was deficient in multiple ways, Plaintiff was sent out for a fitness-for-duty exam on March 4, 2014. (Doc. 34, at 11). As part of her exam, Plaintiff was interviewed in detail by an independent examiner, Dr. Chris Modrall, Ph. D. (Doc. 40-3, at 174). Dr. Modrall prepared a detailed report for P&G based on this interview, as well as a discussion between Dr. Modrall and Plaintiff's treating therapist,

Valerie Wevers, LPCC. (*Id.* at 174–88). Dr. Modrall's report stated her opinion that Plaintiff should not return to work immediately as a result of her emotional fitness. (*Id.* at 185). The report suggested that Plaintiff go on short term disability until a future evaluation deemed her fit to return. (*Id.* at 186). The report also stated that "it would be beneficial to let [Plaintiff] transfer to another position given Plaintiff's ingrained distrust of Ms. Konerman and Mr. Hall. (*Id.* at 187). Following the exam, Plaintiff left work and entered into a treatment center for two to three weeks. (Doc. 29, at 356). Plaintiff returned to work on June 25, 2014.

On March 26, 2014, while Plaintiff was on her leave of absence, she contacted Ty Rashid and requested an accommodation in the form of a transfer to another department, citing Dr. Modrall's statement that such a move would be beneficial. (Doc. 33-1. at 109–10). Mr. Rashid responded that, as Plaintiff was still able to perform the essential duties of a customs broker despite her disability, it was P&G's position that a transfer was not an appropriate accommodation for disability status. (*Id.* at 109). Mr. Rashid requested that Plaintiff communicate with her doctor and contact him if there were any accommodations she required to perform her role as a customs broker. (*Id.*). Plaintiff reiterated her desire to transfer, but requested no other accommodations. (*Id.*).

Additionally while Plaintiff was on leave, she made a complaint through P&G's employee complaint line. (Doc. 29, at 195–96). This prompted Defendant to initiate a second investigation into Plaintiff's allegations of discrimination and retaliation for use of FMLA leave. The investigation was conducted by P&G HR executive Lisa Thorner, who interviewed Ms. Konerman, Mr. Hall, Mr. Rashid, and others. Ms. Thorner's

investigation returned the same results as the initial investigation conducted by Mr. Rashid—while P&G conceded that "there were things that could have been managed better" with respect to Plaintiff's feedback and disciplinary measures, no discrimination, harassment, or retaliation took place. (Doc. 35-1, at 36).

Following Plaintiff's return to work on June 25, 2014, Plaintiff's PIP was closed in order to give Plaintiff a fresh start. (Doc. 31, at 12). Plaintiff was given a 3 rating for the 2014 fiscal year due to her ongoing performance issues, including several performance issues in her work that had been discovered during her leave of absence. (Doc. 34, at 12). Plaintiff was offered the opportunity to receive an "out of cycle" performance rating six months into the new fiscal year to give her an early opportunity to demonstrate improved performance and increase her chances of transferring to another department within P&G. (Doc. 29-1, at 147). At the six-month out of cycle rating, Plaintiff was upgraded to a 2 ranking in recognition of her improved performance. (Doc. 29, at 188). Plaintiff was then able to transfer to the Trademark Licensing department at P&G where she works today. (*Id.* at 317–18). Plaintiff remains qualified for FMLA leave (for her son's medical condition as well as her own), which she takes as needed. (*Id.*).

### B. Procedural History

Plaintiff filed the complaint commencing this civil action on August 6, 2015. (Doc. 1). The complaint raises claims of FMLA retaliation, FMLA interference, and disability discrimination in violation of O.R.C. § 4112. (*Id.* at 7–8). Following

discovery, Defendant filed the instant motion for summary judgment on August 11, 2017. (Doc. 34). That motion is now ripe for review.

## II.    STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## III.    ANALYSIS

### A.    Disability Discrimination Claim

Plaintiff alleges that Defendant's actions following her increased need to take FMLA leave for her own disability amounted to disability discrimination in violation of Ohio Revised Code § 4112.02(A). (Doc. 1, at 8).

The Supreme Court of Ohio has held that Ohio courts may look to cases and regulations interpreting the federal Americans with Disabilities Act ("ADA") in

interpreting the Ohio antidiscrimination statutes. *Columbus Civ. Serv. Comm.*, 82 Ohio St.3d at 573, 697 N.E.2d at 206–07. The elements of a *prima facie* case under the ADA are virtually identical. *Gamble v. JP Morgan Chase & Co.*, Case No. 16-6488, 2017 WL 1908187, at *4 (6th Cir. May 9, 2017) (citing *Whitfield v. Tennessee,* 639 F.3d 253, 258–59 (6th Cir. 2011)); *Taylor v. Phoenixville School Dist.* 184 F.3d 296, 306 3d Cir. 1999). Both utilize the familiar burden-shifting analysis delineated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Accordingly, the burden is initially on a plaintiff employee to provide a *prima facie* case for discrimination. If the plaintiff does so, the burden shifts to the employer to produce evidence of a legitimate, nondiscriminatory reason for its actions. If the employer does so, the burden shifts back to the plaintiff to demonstrate that the employer's offered nondiscriminatory reasons for acting were merely pretext for discrimination. *See McDonnell*, 411 U.S. at 802–03.

To establish a *prima facie* case of disability discrimination, Plaintiff must demonstrate (1) that she was disabled, (2) that an adverse employment action was taken by her employer, at least in part, because the individual was disabled, and (3) that the person, though disabled, can safely and substantially perform the essential function of the job in question. *Columbus Civ. Serv. Comm. v. McGlone*, 697 N.E.2d 204, 206 (Ohio 1998). For purposes of this motion, it is undisputed that Plaintiff, who suffers from depression, is disabled as defined by Ohio antidiscrimination statutes and the ADA.

1. **Plaintiff cannot make a prima facie case of disability discrimination**

   a. **Plaintiff has shown a dispute of material fact regarding whether Defendant was aware of her disability sufficient to satisfy that factor of a *prima facie* case**

Defendant's motion to for summary judgment argues that Plaintiff cannot establish a *prima facie* case of disability discrimination because there is no evidence that P&G or any or Plaintiff's superiors at work knew she was disabled.  (Doc. 34, at 18).  While an employer can be given constructive notice that an individual is disabled without receiving an actual diagnosis based on that individual's behavior, "[t]he fact that an employee is generally sickly or possesses a constitution that is prone to illness is not enough to bring that employee within the protection of the ADA."  *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 881–82 (6th Cir. 1996).  Defendant argues that it was only put on constructive notice that Plaintiff may be suffering a disability after ██████████ ██████████████████████████, and that none of Plaintiff's actions prior to that could fairly put P&G on notice that she was suffering from depression.  (Doc. 44, at 8).

However, the evidence on the record raises a genuine dispute of material fact that would allow a jury to conclude that Defendant had constructive notice of Plaintiff's disability as early as October 2013, before many of Defendant's allegedly discriminatory actions.  Plaintiff had been known to break down, lose control, and cry at her desk on several occasions in the fall of 2013.  (*See* Doc. 40, at 19–20; Doc. 40-4, at 1).  Plaintiff's immediate supervisor, Barbara Konerman, was also informed about ██████████████ ██████████ in October 2013.  (Doc. 32, at 12).  ██████████ was relayed to Ms.

Konerman's supervisor, Jason Hall. (*Id.*; *see also* Doc. 42, at 3). These facts individually may not have been sufficient to give constructive notice of Plaintiff's depression, but together they raise at least enough of a factual dispute for a reasonable juror to conclude that P&G should have known Plaintiff was disabled.

### b. Defendant took no adverse employment action against Plaintiff

Plaintiff's disability discrimination claim must be dismissed because the evidence before the Court demonstrates beyond a genuine dispute of material fact that Defendant took no employment actions against Plaintiff as a result of her disability that could be considered adverse under O.R.C. § 4112.

Plaintiff's memorandum in opposition to Defendant's motion for summary judgment identifies several actions taken by Defendant that were allegedly adverse actions motivated by Plaintiff's disability. The allegedly adverse employment actions are as follows:

1) Plaintiff received a "3" rating on her annual performance evaluation in the 2013/2014 Fiscal Year;

2) Plaintiff did not receive a raise from August 2012 until August 2015;

3) Plaintiff was placed on a Performance Improvement Plan (PIP) by Defendant on November 1, 2013;

4) At one point, Plaintiff's immediate supervisor forbid Plaintiff from working at home even though other employees in Plaintiff's department were permitted to do so up to 50% of the time;

5) Beginning in late 2013, Defendant began requiring Plaintiff to use four hours of paid vacation time whenever she had an FMLA absence, regardless of the length of the absence. Prior to this,

Defendant had allowed Plaintiff to use unpaid off time to handle these absences, and only as much as was required.

6)      Beginning in December 2013, Defendant required Plaintiff to present a doctor's note to the P&G Health Center after every FMLA appointment.

7)      Approximately 20% of Plaintiff's work responsibilities were reassigned.

(*See* Doc. 40, at 13–17).  It is undisputed that Plaintiff never received a demotion in title or a reduction in salary during the time period in question.

Although each of the actions listed above is undoubtedly "adverse" in a general sense, that does not necessarily mean they merit intervention from the Court pursuant to O.R.C. § 4112.  Adverse employment actions that are actionable under antidiscrimination laws are those "of the magnitude of a termination of employment, a demotion, a decrease in salary, or a material loss of benefits." *Worthy v. Materials Processing, Inc.*, 433 Fed. Appx. 374, 375 (6th Cir. 2011).  "[N]ot everything that makes an employee unhappy is an actionable adverse action.  Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996). Employment actions causing humiliation, hurt feelings, and bruised egos therefore do not rise to the level of an adverse employment action. *Id*.

None of Defendant's actions raised in Plaintiff's response to the motion for summary judgment rises to the level of an adverse action under O.R.C. § 4112.  The Court shall address each of Defendant's actions in turn.

1)    *Plaintiff received a "3" rating on her annual performance evaluation in the 2013/2014 Fiscal Year;*

P&G uses an annual employee performance rating system wherein each employee receives either a "1", "2", or "3" ranking, with a 1 indicating that the employee exceeded expectations, a 2 meaning an employee met expectations, and a 3 meaning an employee performed below expectations.  (Doc. 34, at 3 fn. 2).  The scores are distributed in a bell curve.  (*Id.*).  Plaintiff was assigned a 3 rating in both her 2013 and 2014 fiscal year evaluation; the latter took place after Plaintiff had taken off work from March 4, 2014 to June 25, 2014 to receive treatment for her depression.  (Doc. 31, at 8).  Plaintiff's immediate supervisor, Barbara Konerman, testified at her deposition that Plaintiff was assigned a 3 rating because she was the poorest performer in the U.S. Customs Compliance department, specifically citing unreliability and lack of dependability with regard to attendance, customer service, and productivity.  (Doc. 32, at 11).

A negative performance evaluation unaccompanied by a demotion, decrease in pay, or other adverse change in the material terms and conditions of employment is not an adverse employment action. *Primes v. Reno*, 190 F.3d 765, 767 (6th Cir. 1999).  Plaintiff argues that by receiving a 3 rating she was completely foreclosed from receiving any raises or performance share economic incentives.  However, the evidence before the Court demonstrates beyond a dispute of material fact that this is not the case.  Tayyib Rashid, who worked for P&G as a human resources manager during the period implicated by the complaint, testified during his deposition regarding the relationship

between an employee's performance evaluations and his or her ability to receive pay

raises:

> Q:    …What if you are a three rated, do you know whether  you
>        can receive a pay raise if you were rated a three?
> A:    It depends.  Typically if you are rated a three, the way that P and G
>        pays their people is there are different rating scales and different
>        salary ranges within those rating scales.  If someone has been
>        historically rated a two and all of a sudden they are rated a three,
>        then they are probably being overpaid according to their rating.
>        ***So that means they can get a raise, yes***.  It is probably going
>        to take a while depending on what they have been paid historically
>        compared to where they are on the rating scale on the pay scale now.
>        So if they still have room based on the three rating, if they
>        still have room, then potentially yes, but if they are rated or been
>        paid kind of high towards the upper end of the two rated spectrum
>        and all of a sudden three rated, probably going to be a while before
>        they get a pay raise.
>        ***It should be clear that just by you being rated a three does
>        not exclude you from getting a pay raise***.  It really depends on the
>        situation and where the employee is on the pay scale.

(Doc. 33, at 34–35 (emphasis added)).  Plaintiff's testimony during her own deposition

confirmed her understanding of P&G's policy on how raises are impacted by

performance evaluations:

> Q:    Does it typically—would you typically get a raise every year?
> A:    No.  It wouldn't be every year.  It would depend on—it depended on
>        the different things.  So it didn't—it wasn't necessarily every year.
> Q:    Okay.  So some years, even if you weren't 3 rated, if you were 1 or 2
>        rated, you may not have gotten a raise, correct?
> A:    Yes.
> Q:    Okay.  ***So the rating doesn't drive whether you get a raise or not; is
>        that right?***
> A:    ***Yes.***

(Doc. 29, at 30 (emphasis added)).  Accordingly, while Plaintiff's performance

evaluation may have had some impact on her future raises, there was no direct

correlation, and Plaintiff never actually saw her salary reduced. Therefore, Plaintiff's

negative evaluation is not in and of itself an adverse employment action that raises

grounds for a discrimination claim under O.R.C. § 4112.

2) *Plaintiff did not receive a raise from August 2012 until August 2015;*

Plaintiff also alleges that Defendant took a discriminatory adverse employment

action against her by failing to award her a pay raise. However, the phrase "adverse

employment action" implies that an action must be taken to apply, and the Sixth Circuit

has accordingly defined an adverse employment action as "a materially adverse *change* in

the terms and conditions of [a plaintiff's] employment." (*White v. Burlington N. & Santa

Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc), *disagreed with on other

grounds*, 548 U.S. 53 (2006) (quoting *Hollins v. Atlantic Co.,* 188 F.3d 652, 662 (6th Cir.

1999) (emphasis added)). The failure to increase Plaintiff's pay does not reflect a change

in Plaintiff's employment, and is therefore not actionable under an O.R.C. § 4112

discrimination claim.

3) *Plaintiff was placed on a Performance Improvement Plan (PIP) by
Defendant on November 1, 2013;*

On November 1, 2013, Plaintiff's then-immediate supervisor, Barbara Konerman,

placed Plaintiff on a "Performance Improvement Plan" (PIP). The plan identifies "focus

areas" that require improvement and sets out tasks that both Plaintiff and her manager

needed to accomplish to achieve success, as well as objective measurements of what

success in these identified problem areas would look like. (Doc. 40-3, at 78–81). Ms.

Konerman, whose motivations for assigning Plaintiff a "3" rating for both the 2013 and

2014 fiscal years were discussed above, stated during her deposition that all employees assigned a 3 rating were placed on a PIP. (Doc. 32, at 36).

The analysis of Plaintiff's being placed on a PIP is similar to that of her "3" rating. It is undisputed that Plaintiff retained her same salary, job title, and basic responsibilities during the time period implicated by Plaintiff's claims. The PIP did not represent a significant change in Plaintiff's employment, and accordingly cannot be considered an adverse employment action giving rise to an O.R.C. § 4112 discrimination claim.

4) *At one point, Plaintiff's immediate supervisor forbid Plaintiff from working at home even though other employees in Plaintiff's department were permitted to do so up to 50% of the time;*

Following Plaintiff's 3 rating and placement into a PIP, P&G revoked Plaintiff's work from home privileges in December 2013. (Doc. 40-4, at 23). Other employees within the U.S. Customs Compliance Department were permitted to work from home 40–50% of the time. (*See* Doc. 32, at 31–32). Plaintiff argues that this elimination of work-from home privileges was a discriminatory adverse employment action.

Unlike the previous alleged actions against Plaintiff, the Court recognizes that recognizes that removing an employee's privileges to work from home is an action undertaken by an employer that reduces the overall benefits of one's employment. However, only a *material* change to the terms and conditions of one's employment can constitute an adverse employment action under an O.R.C. § 4112 discrimination claim. Defendant's reply memorandum in support of its motion for summary judgment cites to significant case law finding that the denial of work from home privileges is not an adverse employment action. (Doc. 44, at 10 (citing *Stone v. Louisiana Dept. of Revenue*,

18

2016 WL 3746199 (E.D. La. 2016) (collecting cases)). The Court agrees that the denial

of work-from-home privileges, without any significant change in salary, job title, or

responsibilities, is not sufficiently severe to be considered an adverse employment action

under an O.R.C. § 4112 discrimination claim.

> 5) *Beginning in late 2013, Defendant began requiring Plaintiff to use four hours of paid vacation time whenever she had an FMLA absence, regardless of the length of the absence. Prior to this, Defendant had allowed Plaintiff to use unpaid off time to handle these absences, and only as much as was required.*

Plaintiff alleges that in December 2013, Barbara Konerman, her immediate

supervisor, informed Plaintiff that she was required to take vacation time whenever she

needed to take an FMLA absence, and that vacation time at P&G was assigned for a

minimum of four hours at a time, regardless of how long Plaintiff was actually required

to be absent. (*See* Doc. 40, at 24). Prior to this, Plaintiff had been permitted to take

unpaid time off for FMLA leave and return to work as soon as she was able. (*Id.* at 24–

25). This directive forced Plaintiff to use what in her mind was unnecessary vacation

time for brief FMLA absences such as an early morning doctor's appointment.

However, the evidence before the Court demonstrates that this change in

scheduling for FMLA time was not specifically directed toward Plaintiff, but was in fact

a policy implemented company-wide by P&G sometime in 2013. (*See* Doc. 33, at 21–22

(deposition testimony of former HR manager Tayyib Rashid)). P&G began requiring

employees taking FMLA leave to use vacation time for the first two weeks of FMLA

leave, and P&G policy also required employees to take leave in four hour increments.

(*See id.*). Employers are specifically authorized by statute to require that FMLA leave be

taken as substitution for any accrued paid leave in accordance with the paid leave policy

in place, so long as the employer pays the employee for the substituted paid leave and

does not discriminate against employees taking FMLA leave in the administration of

FMLA policies. 29 C.F.R. § 825.207. Defendant had the right to require Plaintiff to use

paid leave for FMLA leave, and Plaintiff was required to take any paid leave in 4-hour

blocks like any other employee. Accordingly, Defendant's explicitly lawful actions

regarding FMLA leave and paid leave cannot be an adverse employment action as

defined by an O.R.C. § 4112 discrimination claim.

6) *Beginning in December 2013, Defendant required Plaintiff to present a doctor's note to the P&G Health Center after every FMLA appointment.*

Plaintiff argues that Defendant's requirement that she present a doctor's note for

her FMLA absences was an adverse employment action. However, like Defendant's

requiring Plaintiff to take vacation time for FMLA leave, Defendant's requiring Plaintiff

to present documentation of FMLA absences is explicitly permitted by the FMLA. 29

C.F.R. § 805.302 ("In the case of medical conditions, the employer may find it necessary

to inquire further to determine if [FMLA] leave is because of a serious health condition

and may request medical certification to support the need for such leave."). Accordingly,

requiring medical documentation supporting FMLA leave cannot be considered an

adverse employment action under an O.R.C. § 4112 discrimination claim.

7) *Approximately 20% of Plaintiff's work responsibilities were reassigned.*

On January 30, 2014, Barbara Konerman informed Plaintiff that a portion of her

assigned work was being reassigned to other colleagues. (Doc. 29-1, at 125). Ms. Konerman stated at this time that the reassignment of work was necessary because Plaintiff was working approximately 75% of normal employee hours. (*Id.* (specifically referencing January 2014)). Plaintiff argues that this reassignment of her workload was detrimental to her employment as it made it harder for her to compete with her peers. (Doc. 40, at 25).

Defendant argues that the approximately 20% reduction in Plaintiff's workload was necessary given Plaintiff's extensive FMLA leave and her inability to complete a full load of work in a satisfactory manner. (Doc. 34, at 8). In support of this assertion, Defendant cites several cases interpreting the FMLA and holding that an employer *must* reassign work in such circumstances so as not to punish an employee for taking FMLA leave. *Pagel v. TIN, Inc.,* 695 F.3d 622, 629 (7th Cir. 2012); *Lewis v. Sch. Dist. #70,* 523 F.3d 730, 743 (7th Cir. 2008); *Holland v. Methodist Hospitals,* 2016 WL 5724355, at *7 (N.D. Ind. Sept. 30, 2016); *see also Hyde v. K.B. Home, Inc.,* 355 Fed. Appx. 266, 269 (6th Cir. 2009) ("An employer may also alter duties or responsibilities in connection with an employee's needs under the FMLA.").

The Court agrees with the reasoning laid out in these opinions. Defendant had a responsibility to accommodate Plaintiff's FMLA leave, which included the appropriate reassignment of some responsibilities as necessary to ensure that Plaintiff could perform adequately. Plaintiff never suffered a reduction in either job title or salary throughout the period implicated in the complaint, and her responsibilities were reduced in an appropriate proportion with the time she was unable to work. (Doc. 43, at 170 (indicating

that approximately 20% of Plaintiff's workload was reassigned)).  Furthermore, steps were taken to ensure that Plaintiff's future evaluations would be based not on the volume of work completed but the percentage of assigned tasks completed, preventing a negative evaluation based on the fact that Plaintiff had less assigned work than her peers.  (Doc. 31, at 14).  Accordingly, Defendant's partial reassignment of Defendant's job responsibilities was not an adverse employment action for purposes of an O.R.C. § 4112 discrimination claim.

None of the actions alleged by Plaintiff to be discriminatory are considered to be adverse employment actions that would be actionable in an O.R.C. § 4112 discrimination claim.  Accordingly, that claim is dismissed.

### B.   Failure to Accommodate Claim

In addition to her standard disability discrimination claim, Plaintiff's complaint also raises the related claim that Defendant failed to appropriately accommodate her disability as required by O.R.C. § 4112.  (Doc. 1, at 8).

Ohio law places a duty on employers to make reasonable accommodations for employees with disabilities: "[A]n employer must make reasonable accommodation to the disability of an employee or applicant, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business."  Ohio Adm. Code 4112–5–08(E)(1); *Shaver v. Wolske & Blue*, 742 N.E.2d at 172 (Ohio Ct. App. 2005) (citing *Pfost v. Ohio State Atty. Gen.* (Apr. 20, 1999), Franklin App. No. 98AP–690, unreported, 1999 WL 236182); *Martinez v. Ohio Dept. of Adm. Serv.* 693 N.E.2d 1152, 1156–57 (Ohio Ct. App. 1997).  Similarly, the ADA prohibits

employers from discriminating against a qualified employee with a disability on the basis of that disability by "not making reasonable accommodations to the known physical or mental limitations of [that employee] . . ., unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(a), (b)(5)(A). *Melange v. City of Ctr. Line*, 482 Fed. Appx. 81, 84 (6th Cir. 2012). "[A]n employer's failure to provide a reasonable accommodation can constitute the type of unlawful discrimination barred by the [ADA]." *Cash v. Siegel–Robert, Inc.,* 548 Fed. App'x 330, 335 (6th Cir. 2013) (citing *Keith v. Cnty. of Oakland,* 703 F.3d 918, 923 (6th Cir. 2013)). The courts likewise recognize that the duty of an employer to make a reasonable accommodation also mandates that the employer interact with an employee in a good faith effort to agree on a reasonable accommodation. *See Rorrer v. City of Stow,* 743 F.3d 1025, 1041 (6th Cir. 2014); *Shaver*, 742 N.E.2d at 171–72 (citing *Taylor* 184 F.3d at 319–320).

In establishing a failure to accommodate claim, a plaintiff bears the burden of establishing she is disabled and the initial burden of requesting an accommodation and showing that the request is objectively reasonable. *Johnson v. Cleveland City School Dist.,* 344 Fed. Appx. 104, 111 (6th Cir. 2011) (citing *Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 870 (6th Cir. 2007)). A *prima facie* case involves a showing that: (1) she is disabled within the meaning of the Act; (2) she is otherwise qualified for the position (with or without reasonable accommodation); (3) her employer knew or had reason to know about her disability; (4) she requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Barber v. Chestnut Land Co.*, 2016-

Ohio-2926, 63 N.E.3d 609, ¶¶ 72-76 (7th Dist.) (citing *DiCarlo v. Potter,* 358 F.3d 408, 419 (6th Cir.2004)). The burden of proof then shifts to the defendant to show that the accommodation would be an undue hardship. *Keith v. County of Oakland,* 703 F.3d 918, 927 (6th Cir. 2013); *Talley v. Family Dollar Stores of Ohio, Inc.,* 542 F.3d 1099, 1108 (6th Cir. 2008); *Doe v. Directions for Youth & Families, Inc*., No. 15-CV-2861, 2016 WL 6093370, at *11 (S.D. Ohio Oct. 19, 2016) (Marbley, J.).

For the purposes of this motion, Defendant has not disputed that Plaintiff is actually disabled or that she is otherwise qualified for her position. Defendant disputes that it was aware of Plaintiff's disability, but as previously discussed, there is a genuine dispute of material fact sufficient to bring that question before a jury. *See supra* Part II.A.1.a.

### 1. Plaintiff did not request a reasonable accommodation

For Plaintiff's failure to accommodate claim to succeed, Plaintiff must demonstrate that she requested an accommodation for her disability and that the requested accommodation was reasonable. It is undisputed that Plaintiff only requested one accommodation—a transfer within P&G to a different department under different supervisors.

Plaintiff's requested accommodation was not a reasonable one because she was able to perform the essential duties of the position she held at the time despite her disability. Under EEOC guidance and Sixth Circuit precedent, a request to transfer to an existing vacant position within a company is only a reasonable accommodation if the employee is no longer able to perform their duties, with or without a reasonable

accommodation. *Kleiber v. Honda of America Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007); *Burns v. Coca-Cola Enterprises, Inc.*, 222 F.3d 247, 256 (6th Cir. 2000); *Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act*, No. 915.002, 2002 WL 31994335 at *20 (E.E.O.C. Guidance Oct. 17, 2002). The "employee has the burden of identifying particular positions to which he could be reassigned based on his qualifications. . ." *Burns*, 222 F.3d at 259.

Plaintiff does not argue that her depression prevented her from performing the duties required of a customs broker in P&G's U.S. Customs Compliance department and that working in a different role was therefore necessary. In fact, Plaintiff's own testimony is that she has always been capable of performing her duties as a customs broker, despite her disability. (*See, e.g.*, Doc. 33-1, at 109 ("[T]he issue is not that I have problems doing the essential functions of Customs broker work. The issue is with the management." ) (emphasis added)). Plaintiff's desire to have new management, while understandable given the background of this case, is not a situation that Defendant is required to accommodate considering that Plaintiff, by her own admission, could perform the essential duties of her job despite her disability.

The evidence also demonstrates beyond any dispute of material fact that Defendant adequately engaged in the interactive process with regard to Plaintiff's request for an accommodation. While Plaintiff was still on medical leave in March 2014, she contacted then-HR Manager Ty Rashid about a potential transfer to a new department. Rashid explained the P&G believed that a department transfer was an inappropriate

accommodation given that Plaintiff could perform the essential functions of her job (a position which, as explained above, was correct), and requested additional information from Plaintiff about other possible accommodations:

> Please work with your doctor and P&G Health Services on the timing of your return as well as the necessary accommodations you will need, if any, to perform your role as a customs broker for P&G. In the alternative, if your doctor concludes that you are unable to perform in your current role, with or without reasonable accommodation, please let us know that as well. If we can assist in that process by speaking with your doctor about the essential functions of your position, or anything else, please do not hesitate to reach out.

(Doc. 33-1, at 109). Plaintiff, however, never alleges to have requested any additional accommodation besides a department transfer. Given the evidence in the record, no reasonable juror could find that P&G failed to engage in the interactive process as required.

Accordingly, Plaintiff's failure to accommodate claim is dismissed.

## C.    FMLA Related Claims

In addition to her discrimination claims, Plaintiff's complaint contains claims of FMLA interference and FMLA retaliation, alleging that Defendant prevented Plaintiff from enjoying the lawful benefits of her assigned FMLA leave and took retaliatory employment actions against Plaintiff in response to her lawful use of FMLA leave.

"The FMLA entitles qualifying employees to up to twelve weeks of unpaid leave each year if, among other things, an employee has a 'serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Walton v. Ford Motor Co.,* 424 F.3d 481, 485 (6th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)

(D)). An employee who utilizes FMLA leave is entitled to be restored to his position, or an equivalent one, when she returns from the leave. 29 U.S.C. § 2614(a)(1).

An employee may allege violations of the FMLA under the entitlement theory or retaliation theory. *Edgar v. JAC Prods.*, *Inc.*, 443 F.3d 501, 507–08 (6th Cir. 2006). The entitlement theory, also known as the interference theory, arises from the provision that it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1); *Edgar*, 443 F.3d at 507. The retaliation theory, sometimes referred to as the discrimination theory, is premised on Section 2615(a)(2), which makes it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA. *Edgar*, 443 F.3d at 508. "[A] single act may potentially constitute both interference and retaliation [.]" *Wallner v. Hilliard*, 590 F. App'x 546, 551 (6th Cir. 2014).

As with Plaintiff's discrimination claims, Plaintiff's FMLA claims place the initial burden upon Plaintiff to provide a *prima facie* case. If an employee proves a *prima facie* case for either FMLA interference or FMLA retaliation, then the burden shifts to the employer to put forth a legitimate nondiscriminatory reason for the adverse employment action. *Reinwald v. The Huntington Nat. Bank*, 684 F.Supp.2d 975, 980 (S.D. Ohio 2010). The burden then shifts back to the plaintiff to prove the offered reason is simply a pretext for discrimination, by proving the offered reason had no basis in fact, did not actually motivate the adverse action, or was insufficient to warrant the adverse action. *Id.* "A plaintiff must do more than simply impugn the legitimacy of the [employer's]

asserted justification … the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Id* (quoting *Warfield Lebanon Correctional Inst.*, 181 F.3d 723, 730 (6th Cir. 1999)).

### 1. Plaintiff has made a *prima facie* case for FMLA interference

To establish a *prima facie* case of FMLA interference, Plaintiff must demonstrate that: (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) she was entitled to leave under the FMLA; (4) she gave the employer notice of her intention to take leave; and (5) the employer denied her FMLA benefits to which she was entitled. *Wysong v. Dow Chem. Co.,* 503 F.3d 441, 446–47 (6th Cir. 2007) (citing *Donald,* 667 F.3d at 761). *Accord Horen v. Cook*, 546 F. Appx. 531, 533–34 (6th Cir. 2013); *Lankford v. Reladyne, LLC*, No. 1:14-CV-682, 2015 WL 7295370, at *4–5 (S.D. Ohio Nov. 19, 2015) (Black, J.). In the context of an interference claim, there is no need for Plaintiff to show evidence of any particular employer motive or intent. *Wallner v. Hilliard*, 590 F. Appx. 546, 550 (6th Cir. 2014); *Edgar v. JAC Products, Inc.,* 443 F.3d 501, 507–08 (6th Cir. 2006). At issue in a FMLA interference claim is simply whether the employer provided its employee the entitlements set forth in the FMLA. *Arban,* 345 F.3d 390, 401 (6th Cir. 2003).

Neither party debates that the first four factors of a *prima facie* case of FMLA interference are present in this case. Defendants argue, however, that Plaintiff has failed to show that she was denied FMLA benefits to which she was entitled because Plaintiff exhausted her FMLA leave, which included leave taken after the allegedly retaliatory actions taken by Defendant.

Defendant's argument is not well taken, as it relies on a far too narrow definition of what constitutes a denial of FMLA benefits. The Sixth Circuit and this Court have repeatedly recognized that "[i]f an employer takes an employment action based, in whole or in part, on the fact that the employee took FMLA protected leave, the employer has denied the employee a benefit to which he is entitled." *Green*, Case No. 3:11-CV-440, 2013 WL 3223629, at *5 (quoting *Wysong,* 503 F.3d at 447) (internal quotations omitted). *Accord Burnett v. Gallia County, Ohio*, Case No. 2:14-CV-2544, 2016 WL 4750107, at *9 (S.D. Ohio Sept. 12, 2016) (Marbley, J.). Thus, a plaintiff satisfies her burden to prove the fifth element of an interference claim by demonstrating that her employer has "somehow used the leave against her and in an unlawful manner, as provided in either the statute or regulations." *Id.* (citing *Wysong, supra*, and *Bradley v. Mary Rutan Hosp.,* 322 F. Supp. 2d 926, 940 (S. D. Ohio 2004) (Marbley, J.)). Under 29 C.F.R. § 825.220(c), "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." As the *Bradley* Court explained:

> It seems clear, then, that there are a variety of ways that an employer can violate the FMLA. Hence, an employer acts unlawfully: 1) by interfering with, restraining or denying the exercise (or attempt to exercise) of FMLA rights (§ 2615(a)(1)); 2) by discharging or discriminating against an individual for opposing practices made unlawful by the Act (§ 2615(a)(2)); 3) by failing to restore an employee out on FMLA leave back to her position, or an equivalent one, upon her return (§ 2614(a)(1)); 4) by taking away benefits an employee had accrued prior to her leave, as a result of her taking leave (§ 2614(a)(2)); 5) by refusing to authorize FMLA leave or discouraging an employee from taking leave (§ 825.220(b)); 6) by discriminating against an employee for taking leave (§ 825.220(c)); and 7) by using the taking of FMLA leave as a negative factor in employment actions, such as hiring, promoting or disciplining (§ 825.220(c)). These

encompass both an employer's prescriptive obligations and its proscriptive obligations. *See Chaffin v. John H. Carter Co., Inc.,* 179 F.3d 316, 319 (5th Cir.1999) ( "employers have a *prescriptive obligation* under the FMLA—they must grant employees substantive rights guaranteed by the FMLA—*and they have a proscriptive obligation—they may not penalize employees for exercising these rights.*")

*Bradley*, 322 F. Supp. 2d at 937–38 (emphasis in original).

The allegedly adverse actions taken against Plaintiff by Defendant were previously discussed in Part II.A.1.b, *supra*. Several of these actions are explicitly permitted by the FMLA (requiring doctors notes for FMLA appointments, requiring Plaintiff to use vacation time for FMLA time off in accordance with company policy, proportional reassignment of work to accommodate time off), and therefore cannot be considered the basis for an FMLA interference claim. *See id.* However, other alleged actions which in the context of a disability discrimination claim could not be considered "adverse employment actions" meet the relatively more open standard to be considered unlawful negative actions taken in response to Plaintiff's use of FMLA leave. If Defendant in fact gave Plaintiff negative annual evaluations, denied her annual pay raises, and took away her work from home privileges because Plaintiff was using FMLA approved leave, that would be actionable. Plaintiff has accordingly made a *prima facie* case for her FMLA interference claim.

## 2. Plaintiff has made a *prima facie* case of FMLA retaliation

In addition to her FMLA interference claim, Plaintiff has also claimed that Defendant retaliated against her for her use of FMLA leave. With regard to the retaliation theory of recovery under the FMLA, 29 U.S.C. § 2615(a)(2) states that "[i]t

shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." To establish a *prima facie* case of FMLA retaliation, a plaintiff must show: (1) she was engaged in an activity protected by the FMLA; (2) her employer knew she was exercising her FMLA rights; (3) after learning of her exercise of FMLA rights, the employer took an adverse employment action; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action. *Donald v. Sybra, Inc.,* 667 F.3d 757, 761 (6th Cir. 2012); *Killiam v. Yorozu Auto. Tenn.,* 454 F.3d 549, 556 (6th Cir. 2006). *See also Adkison v. The Proctor & Gamble Co.,* Case No. 1:10-cv-00085-TSB, 2011 WL 6371084, *10 (S. D. Ohio Dec. 19, 2011) (Black, J.).

Plaintiff has made an adequate *prima facie* case for FMLA interference. There is no dispute about the first two factors of Plaintiff's *prima facie* case—she was engaged in protected activity and her employer had notice. As previously discussed, Defendant took adverse employment actions against Plaintiff (as defined by the FMLA and interpreting case law). *See supra* Part II.C.1. Furthermore, Defendant admits that several of the negative actions taken against Plaintiff, such as the negative performance review, corresponding PIP plan, and loss of work from home privileges, stemmed from Plaintiff's FMLA absences. Defendant argues that the reason behind these negative actions was Plaintiff's failure to provide adequate warning for qualifying absences as required by the FMLA. This argument is relevant in evaluating whether Defendant had a legitimate, nondiscriminatory reason for its actions, but, at the *prima facie* evaluation stage, the fact

that the motivations behind Defendant's actions stemmed from Plaintiff's FMLA use is sufficient to find that Plaintiff has indeed made a *prima facie* claim of FMLA retaliation.

### 3. Defendant has offered a legitimate, nondiscriminatory reason for its actions

Because Plaintiff has made a *prima facie* case for both FMLA interference and FMLA retaliation, the burden shifts to Defendant to justify the adverse employment actions taken against Plaintiff.

As previously discussed, many of the allegedly adverse actions attributed to Defendant by Plaintiff's response to the pending motion for summary judgment are explicitly permitted by the FMLA; Defendant is not required to provide further justification for these actions, as they are not properly the basis for an FMLA interference claim or an FMLA retaliation claim. These explicitly permitted actions include requiring Plaintiff to provide a doctor's note justifying her appointments, requiring Plaintiff to use vacation time for FMLA leave in accordance with P&G policy, and reassigning a portion of Plaintiff's duties proportional to the time she was unable to be at work.

Defendant's justification for the other adverse employment actions taken against Plaintiff revolves around Plaintiff's frequent non-FMLA absences, her inability or refusal to maintain a consistent schedule as required (outside of FMLA leave), and her repeated failure to notify P&G of her need to take FMLA leave as soon as was practicable. (*See* Doc. 34, at 20 ("[Plaintiff] was given a "3" rating in 2012–2013 because of her constant last-minute scheduling changes and her excessive non-FMLA absences . . .")).

The FMLA imposes extensive ongoing obligations on employees to give notice of the need for intermittent leave. When an employee knows they will need FMLA leave, the law requires them to notify their employer at least 30 days in advance. 29 C.F.R. §§ 825.302(a), 825.304(b). When the employee has advance knowledge of leave, but less than 30 days knowledge, the employee must notify the employer of the need for leave as soon as it is possible and practical for the employee do to so. 29 C.F.R. §§ 825.302(a), 825.304(c). Where the need for leave is completely unforeseeable, the employee must notify the employer as soon as it is possible and practical for the employee to do so. 29 C.F.R. §§ 825.302(a), 825.304(d). Employees can be lawfully disciplined for failing to give proper advance notice of FMLA leave. *Acker v General Motors, L.L.C.,* 853 F.3d 784, 790-91 (5th Cir. 2017).

The evidence before the Court leads to the conclusion beyond a dispute of material fact that Plaintiff had issues with her attendance and with giving notice that warranted disciplinary action. Plaintiff's own deposition testimony establishes that, while employed in the U.S. Customs Compliance Department, Plaintiff made the unilateral decision to vary her work schedule without authority from her supervisors even after being instructed that this was improper:

> Q. Did you come in at different times when you were working in regulatory [Plaintiff's position at P&G before joining the U.S. Customs Compliance department]?
> A. Yes.
> Q. Okay. You just—and when I say different times, I mean, would it fluctuate day to day, week to week what time you would come in?
> A. Yes.
> Q. And when you were in custom compliance the first time around, same did the did the same hold true; did you come in at different times?

A.    Yeah. I don't remember back then.

Q.    Okay. And then after Wade talked to you about coming in at the same time every day, did—did you do that?

A.    Yes. I—I think I made much more of an attempt to come and have a more consistent schedule.

Q.    Okay. So you knew even before Barb became your supervisor that that was an expectation of you in this position in custom compliance?

MS. NEFF [Plaintiff's Attorney]:  Objection.  You can answer.

A.    Okay. Let's see. I—I knew that until—until Jason [Hall, the immediate supervisor of Plaintiff's immediate supervisor, Barbara Konerman] came.

BY MR. MOORE [Defense attorney]:

Q.    You knew it until Jason came?

A.    Yes.

Q.    Okay. And when did Jason come?

A.    I don't remember when Jason came.

Q.    Okay. So from the time that you started in—or came back to custom compliance in 2011 until the time Jason came, you knew you were supposed—you knew you were expected to be at work at the same time?

MS. NEFF:   Objection.  You can answer. Sorry.

A.    Yes.

BY MR. MOORE:

Q.    You know you had set hours? I don't know what they were but—

A.    Yes.

Q.    What were they?

A.    I don't know.

Q.    Okay. But you know, for example, you were supposed to be in at 9:00 and leave at 5:00 every day; is that correct?

A.    Yes.

Q.    Okay. Now, what changed when Jason came?

A.    Jason came in at variable hours, different hours every day.

Q.    And Jason was Ms. Konerman's boss, correct?

A.    Yes.

Q.    Okay. So what was it about the fact that your boss's boss came in at different hours every day that led you to believe that you were no longer supposed to come in at the same time?

A.    I felt like he was setting an example for us and that if it was okay for him to come in at 8:00 some mornings sometime and 10:00 sometime and 9:30 sometime and 10:30 sometime and different hours, then he was setting the example that it was all right for us to

34

have different hours, also, and that it—we—that we weren't—that it was all right for us to vary our hours to an extent.

Q. Okay. Did other analysts vary their hours after Jason came onboard?

A. I don't know.

Q. Now, was Jason doing the same job that you were doing as an analyst?

A. No.

Q. Was Jason responsible for fending customer calls in your role as an analyst?

A. No.

Q. Okay. So did that cross your mind at all, that Jason had different responsibilities than you did and, therefore, what he did in terms of coming in to work did not apply to you?

A. No.

Q. Okay. But no one ever told you you were relieved from the responsibility of coming in during a set set of hours, right?

A. No.

Q. That was a decision you made on your own, correct?

A. Yes.

Q. And did you announce to Jason or Barb that you had made this decision?

A. No.

Q. You just started coming in at random times; is that right?

A. I wouldn't say random times.

Q. Okay. Different times, is that a better way to put it?

A. Okay. Yes.

(Doc. 29, at 34–37). Plaintiff's admitted disregard for the instructions given by her employer regarding maintaining a consistent work schedule is unrelated to any FMLA protection and was a legitimate reason for Defendant to take disciplinary action.

Additionally, the evidence on record shows that Plaintiff had issues with last-minute notification of FMLA leave, including in several instances when Plaintiff could have informed P&G of the leave much earlier. Defendant compiled a list of Plaintiff's alleged non-FMLA related availability issues and last-minute schedule changes (both FMLA and non-FMLA). (Doc. 34-1). The list attributes to Plaintiff 34 such issues

between April 2012 and July 2013.  (*Id.*).  Plaintiff's response to the motion for summary

judgment included a detailed list of responses to each of these 34 alleged incidents.

(Doc. 41-3).  Plaintiff's response list identified which incidents were FMLA leave and

which were leave for other reasons.  (*Id.*).  For some of the marked incidents, Plaintiff has

alleged that the FMLA time requested was in response to a sudden medical emergency

(for either herself or her son whose condition qualified her for FMLA leave).  (*Id.*).  Were

those the only incidents identified by Defendant, disciplinary action for failure to notify

of upcoming FMLA absences would not be warranted.  However, the Court's review of

Plaintiff's response reveals that on at least seven occasions Plaintiff admits to giving last

minute notice to P&G about FMLA appointments where no emergency was claimed.

These last minute notifications failed to meet Plaintiff's notice obligations under the

FMLA, and were therefore appropriately a motivation for the relatively minor

disciplinary employment actions taken by Defendant.

Accordingly, Defendant has adequately articulated a legitimate, nondiscriminatory

reason for its actions.

### 4. Plaintiff cannot demonstrate that Defendant's legitimate, nondiscriminatory reason for its actions was merely pretext

Because Defendant has adequately articulated a legitimate, nondiscriminatory

reason for its adverse employment actions, Plaintiff must demonstrate that the offered

reason is merely a pretext for an unlawful motivation in order to succeed on either her

FMLA interference claim or her FMLA retaliation claim.  "[P]laintiff can show pretext in

three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the

proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." *Romans v. Michigan Dept. of Human Servs.,* 668 F.3d 826, 839 (6th Cir. 2012 (citing *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir.2009)). Plaintiff cannot demonstrate that the proffered reasons either had no basis in fact or were insufficient to motivate the employer's action, and so must demonstrate that Defendant's disciplinary actions were in fact motivated by her taking FMLA leave.

Plaintiff argues in her response to the motion for summary judgment that Defendant's given reasons for its actions lacks credibility. Plaintiff's main argument relies on the alleged discrepancies in how Defendant treated Plaintiff's FMLA leave requests prior to 2012, when she took FMLA leave only for her son's qualifying condition, and how Defendant treated Plaintiff's FMLA requests once she began to take qualifying FMLA leave for her depression as well. Specifically, Plaintiff states that prior to taking leave for her own condition Plaintiff was allowed to take FMLA leave without using her vacation time and Plaintiff did not have to get a doctor's note for FMLA appointments. (Doc. 40, at 58–59; Doc. 40-4, at 3). Plaintiff also cites Defendant's decision to extend Plaintiff's core work hours from 9:00–3:00 to 9:00–5:30 and instructions that Plaintiff was to go home if she could not stop crying at work, both implemented in December 2013, as a reflection of Defendant's retaliation for Plaintiff's FMLA use. (Doc. 40, at 58–59; Doc. 40-4, at 3).

Plaintiff compares her case to *Green v. Wal-Mart Stores*, *Inc.*, in which this Court found that a plaintiff employee had demonstrated sufficient evidence of pretext defeat a

motion for summary judgment on her FMLA interference and FMLA retaliation claims. 2013 WL 3223629 (S.D. Ohio June 25, 2013) (Black, J). However, the cases are inapposite.

In *Green*, Plaintiff was terminated two days after receiving approval for intermittent FMLA leave to care for her husband, and the same day she had informed her employer of her husband's need for a quadruple bypass surgery. *Id.* at *2. The defendant had defended the termination as the result of Plaintiff's progression through the company's "progressive disciplinary plan," which outlined specific coaching steps for various numbers of unexcused absences that would ultimately result in termination. However, the record demonstrated that the employer had not actually applied its disciplinary plan consistently; the plaintiff had in the past acquired enough unexcused absences to trigger steps in the plan, but it was only once Plaintiff began taking FMLA leave that the plan was ever initiated. *Id.*at *6. This discrepancy raised a genuine issue of material fact that it was the FMLA leave itself that triggered the employer's increased scrutiny.

That is not the case here. Plaintiff has been using approved FMLA leave for "almost the entirety of" her 17 year career at P&G, and did so without significant incident until 2012. (Doc. 40, at 10). The record in this case clearly demonstrates that disciplinary actions taken against Plaintiff either: (1) were not taken against Plaintiff at all but were the result of changed company policy, as with the requirement that FMLA time be used as vacation time (*see* Doc. 33, at 21–22) or (2) were the culmination of Plaintiff's failure to improve after consistent feedback from her supervisors regarding

their justifiable concerns related to her non-FMLA absences and lack of notification for FMLA non-emergency absences. The fact that Plaintiff was able to use FMLA leave without incident for over a decade belies any argument that Plaintiff's use of FMLA leave caused Defendant to retaliate against Plaintiff, especially in light of Defendant's well-documented legitimate reasons for taking the minor disciplinary actions against Plaintiff that occurred. No reasonable juror could look at the evidence before the Court and conclude that Defendant's proffered reasons for the actions taken against Plaintiff were pretext for FMLA interference or FMLA retaliation.

Accordingly, Plaintiff's FMLA interference and FMLA retaliation claims are dismissed.

## IV.    CONCLUSION

Accordingly, for the reasons outlined above, Defendant's motion for summary judgment  (Doc. 34) is **GRANTED.**  This case is **DISMISSED WITH PREJUDICE.** The Clerk shall enter judgment accordingly, whereupon this case shall be **TERMINATED** in this Court.

**IT IS SO ORDERED.**

Date:  _11/17/17_

Timothy S. Black
United States District Judge